IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: 4:15-CR-00868-RBH-2 |
| | ) | |
| vs. | ) | |
| | ) | **SENTENCING MEMORANDUM IN** |
| BRIAN KEITH PERDUE, | ) | **SUPPORT OF DOWNWARD** |
| | ) | **DEPARTURE AND DOWNWARD** |
| Defendant. | ) | **VARIANCE** |
| | ) | |

## INTRODUCTION

On July 26, 2016, Brian Keith Perdue pled guilty to 18 U.S.C. § 371 (Conspiracy to Commit Application Fraud). As evidenced by his cooperation with the Government since early 2012, which was before the Indictment was filed in this case, and his guilty plea, Mr. Perdue accepts full responsibility for his actions. The purpose of this sentencing memorandum is to provide the Court with a broader view of the underlying facts of the offense along a more complete view of Mr. Perdue's life to demonstrate that the conduct and conviction, albeit serious, were one part of an otherwise exemplary life. Mr. Purdue, by and through his undersigned counsel, respectfully submits this memorandum in support of his motion for downward departure and his motion for a downward variance, and moves the Court to impose a non-incarceration sentence of probation in this matter.

## BACKGROUND AND PROCEDURAL HISTORY

Mr. Perdue is one of two Defendants named in a one-count Indictment, which was filed in the District of South Carolina, Florence Division on December 8, 2015. The Indictment charged Mr. Perdue, and a Co-Defendant, Michael Lane Prevette, with Conspiracy to Commit Application Fraud in violation of 18 U.S.C. § 371. On January 6, 2016, Mr. Perdue was

arraigned and released on a $25,000 unsecured bond.[1]  Mr. Perdue entered a plea of guilty to Count 1 on July 26, 2016.

Mr. Perdue was interviewed by the United States Probation Office in preparation of the Pre-Sentence Investigation Report, (hereinafter "PSR"), which was prepared on October 7, 2016. Mr. Perdue timely submitted objections to the PSR on October 28, 2016.   An Addendum to the PSR was prepared on October 28, 2016.

On December 12, 2016, the Government filed a Motion for Downward Departure pursuant to § 5K1.1 of the *United States Sentencing Guidelines* (hereinafter USSG) and 18 U.S.C. § 3553(e) based upon Mr. Perdue's cooperation and substantial assistance.

## ARGUMENT

**I. The Restitution amount in the PSR should be amended to reflect the actual loss amount.**

Mr. Perdue objected to Paragraph B of the FORFEITURE section of the PSR due to an incorrect amount being used for the calculation of restitution in this case.  The PSR calculated the loss amount to victims in this case to be $926,739.02.

Paragraphs 8, 9, 10, 11, 12, which summarize the losses on each of the four (4) properties, found the loss amounts to victims as follows:

- 1000-A Kelly Court, Murrells Inlet, SC - $162,797.81.
- 1004-A Kelly Court, Murrells Inlet, SC - $275,624.57.
- 1905 Edge Drive, Unit 3, North Myrtle Beach, SC - $281,326.64.
- 334 Cypress Avenue, Garden City, SC - $167,000.

Total Amount of loss to victims - $886,749.02

---

[1] Mr. Perdue has remained out on bond while this case has been pending and he has resided in Manassas, Virginia.

The correct amount of the Cash Proceeds/Money Judgment should equal $886,749.02, which is the amount of the calculated loss to victims in the case. Mr. Perdue requests the Government to amend the Preliminary Order of Forfeiture to account for the appropriate amount of restitution in this case.

## II. Mr. Perdue is eligible for a non-incarceration sentence of probation based upon 5H1.6 of the USSG, 5K1.1 of the USSG and 18 U.S.C. § 3553(e), and a downward variance pursuant to 18 U.S.C. § 3553(a).

The PSR in this case reflects that the advisory Guidelines Range, based upon a total offense level of 17 and criminal history category of 1, (Mr. Perdue has no criminal history) and prior to any departure and variance, is 24 to 30 months. However, as recognized by the United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines are advisory rather than mandatory. Moreover, a district court must consider all of the factors set forth in 18 U.S.C. § 3553(a), and may not presume that the Guidelines range is reasonable. *Gall v. United States*, 552 U.S. 38, 50 (2007); see also *Nelson v. United States*, 555 U.S. 350, 352 (2009); *Rita v. United States*, 551 U.S. 338, 351 (2007). Thus, while the Guidelines deserve consideration, they do not prevent this Court from sentencing Mr. Perdue to a non-incarceration sentence of probation by way of his minimal role in the offense when compared to his Co-Defendant, a downward departure pursuant to 5H1.6 of the USSG, 5K1.1 of the USSG and 18 U.S.C. § 3553(e), and a downward variance pursuant to 18 U.S.C. § 3553(a).

### A. Mr. Perdue should receive a four (4) level reduction for being a minimal participant.

Mr. Perdue's PSR failed to include a reduction for being a minimal participant. As a result, Mr. Perdue timely raised objections, which are before the Court for consideration.

Section 3B1.2, USSG allows for a defendant to receive a reduction based upon whether he is deemed a minimal or minor participant.  Application Note 4 to the Commentary of §3B1.2, U.S.S.G., provides that the minimal participant reduction is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group.  Also under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.  A minimal role in an offense entitles a defendant to consideration for a 4 level departure. § 3B1.2.

Application Note 5 to the Commentary of §3B1.2, USSG provides that the minor participant reduction is intended to cover a defendant who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal.  A minor role in an offense entitles a defendant to consideration for a 2 level departure. § 3B1.2.

In a case which falls in between subsections (a) and (b) of § 3B1.2, the defendant may be given consideration for a 3 level departure.

In this case, Mr. Perdue submits that the PSR should have included a four (4) level reduction for his role as a minimal participant in the offense based upon the little understanding of the overall scope and structure of the criminal activity, his participation in the scheme when compared to other participant(s), his limited decision-making authority in being directed by his Co-Defendant, and the fact that he received no financial benefit from his participation in the scheme.

Application Note 3(C) to the Commentary of § 3B1.2 provides that the determination of whether to apply subsection (a) as a minimal participant, or subsection (b) as a minor participant, is based on a totality of the circumstances and the Court should consider the following non-exhaustive list of factors:

(i) The degree to which the defendant understood the scope and structure of the criminal activity;

(ii) The degree to which the defendant participated in planning or organizing the criminal activity;

(iii) The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) The nature and extent of the defendant's participation in the commission of criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) The degree to which the defendant stood to benefit from the criminal activity.

Mr. Perdue had very minimal knowledge of the scope and structure of the criminal activity that he was participating in. His involvement as a real estate appraiser was a small role in a much larger, detailed and well-orchestrated scheme developed by his Co-Defendant, Michael Lane Prevette. (hereinafter Co-Defendant). Co-Defendant[2] organized a scheme involving the sale of properties in the Myrtle Beach area, in which he would facilitate and arrange for payment to be made by a person other than the purchaser of the property. (PSR at ¶ 2(D) (a) and (b)). He created fictitious financial statements in the names of the borrowers claiming hundreds of thousands of dollars were on deposit in the borrower's names in stocks or cash. (*See* Federal Bureau of Investigation Case Summary). These borrowers would eventually be paid kickbacks outside of the real estate closings by businesses owned by Co-Defendant and/or Co-Defendant and his parents.[3] *Id*. Additionally, companies owned by Co-Defendant, or companies owned by Co-Defendant and his parents, provided buyers with the down payment funds. *Id*. These funds were either provided directly to the closing attorney or were deposited to the buyer's account and then forwarded by the borrower to the closing attorney. *Id*.

---

[2] Mr. Prevette was previously convicted in 2006 for fraud related offenses in the United States District Court, Southern District of Alabama.

[3] FBI Investigation case summary reveals that borrowers received at least $111,000.00 in kickbacks outside of the closing of real estate.

In order to carry out the scheme and to make significant profit, the Co-Defendant had to have the services of a real estate appraiser to inflate the values of real estate. To facilitate this need, he recruited the services of Mr. Perdue, who at the time was a real estate appraiser and who was eventually looking to get out of the appraisal business for financial reasons. *Id*. (*See also* Brian Keith Perdue FBI 302 Report dated January 26, 2012.) Co-Defendant preyed upon Mr. Perdue and lured him into working for his development company by conveying that he could begin working with him as an appraiser and eventually he would become Co-Defendant's project manager. (*See* Brian Keith Perdue FBI 302 Report dated January 26, 2012.) Co-Defendant went as far to invite Mr. Perdue's wife to all of the meetings in an effort to try to gain approval for Mr. Perdue to join his business. *Id*. In joining the Co-Defendant, Mr. Perdue had a very limited knowledge of the overall scope and structure of the scheme that he was participating in and only viewed this relationship as a means to help him segue out of the appraisal business.

When he joined Co-Defendant, Mr. Perdue did not know what he was getting involved in. Mr. Perdue believed Co-Defendant requested inflated appraisals because he was pulling money/equity out of the properties he purchased to use in other real estate developments and projects. *Id*. Mr. Perdue never considered why a buyer would be willing to pay the inflated prices for the houses he appraised and Co-Defendant never told him how he found buyers for the houses. *Id*. Mr. Perdue only viewed this relationship as a way to get out of the appraisal business. He did not know any of the other individuals who were involved in the overall scheme, which was designed by Co-Defendant with the specific goal of making profit at the expense of the lenders who loaned money for the purchase of real estate.

When compared to others who participated in this scheme and with regard to his decision-making authority, Mr. Perdue had a minimal role in that he produced inflated appraisals

for properties at the sole direction of Co-Defendant. (PSR at ¶ 2(D)(c)). His Co-Defendant would give him the price/target, and he was instructed to meet this price/target with the appraisal he prepared. (*See* Brian Keith Perdue FBI 302 Report dated March 2, 2016.) He made no decisions outside of what the Co-Defendant instructed him to do. While it cannot be overlooked that Mr. Perdue produced the inflated appraisals which were important to Co-Defendant's scheme, when you view the scheme in its totality, there were many other individuals who had a much more integral involvement in accomplishing the goals of the scheme of Co-Defendant, and these individuals actually received profit from the scheme.

Additionally, and a point that cannot be overlooked, Mr. Perdue did not have any proprietary interest in the overall scheme, and was never even paid for the appraisals he performed on the four (4) properties involved in this matter. He submitted a $15,000 invoice for unpaid services, which was never paid by the Co-Defendant. (*See* Brian Keith Perdue FBI 302 Report dated March 2, 2016.) The Co-Defendant and others involved in the scheme were the only individuals who had a proprietary interest and profited from it.

When this case is viewed in its totality, it is apparent that Mr. Perdue was a minimal participant due to his limited understanding of the overall scope and structure of the criminal activity, his participation in the scheme when compared to other participant(s), his limited decision-making authority in being directed by his Co-Defendant, and the fact that he received no financial benefit from his participation in the scheme.

For these reasons, Mr. Perdue should receive a four (4) level reduction for his minimal participation in the overall scheme that was carried out by his Co-Defendant.

**B. Mr. Perdue should receive a significant departure based upon the Government's Motion for Downward Departure pursuant to 5K1.1 of the USSG. and 18 U.S.C. § 3553(e).**

In support of its Motion for Downward Departure for Mr. Perdue, the Government acknowledges that Mr. Perdue provided truthful information concerning mortgage fraud, and his cooperation began before his charge when he was not represented by counsel and continued after he was indicted. The information he provided included his own illegal actions. Mr. Perdue also provided information concerning the illegal activities of his Co-Defendant, who ultimately also entered a plea of guilty. The Government further acknowledges that the information and assistance from the Mr. Perdue have proven substantial, such that he is an appropriate candidate for a downward departure.

In determining the appropriate downward departure amount, it is important to look at not only the type of information that was given by Mr. Perdue, and the trustworthiness and reliability of his information, but also the timeliness of his cooperation as well. Mr. Perdue began cooperating with the Government over five (5) years ago on January 26, 2012 when he was first interviewed by F.B.I. agents. This was approximately three (3) years before the indictment was filed in this case. By cooperating this early, it enabled the F.B.I. to prepare a sketch of the overall case and have a better understanding of how Mr. Perdue's Co-Defendant orchestrated this scheme. It also provided the F.B.I. with a list of potential subjects who were heavily involved in the real estate closings which included a hard money lender that had connections with Co-Defendant, borrowers who were linked to the Co-Defendant and companies that Co-Defendant was associated with. The timeliness of Mr. Perdue's cooperation along with the information that was obtained by the F.B.I. was very important to developing this case. It is a big reason why the Government was eventually able to secure a guilty plea from Co-Defendant. Mr. Perdue's

cooperation was not just limited to information about other individuals.  He also provided the Government with information on his own involvement in this case and the illegal actions performed by him in preparing inflated appraisals.

When Mr. Perdue was faced with a very stressful situation, he responded by being very cooperative and providing valuable information for the investigation and, most importantly, he admitted fault for what he had done.  Based upon these reasons, Mr. Perdue submits that he has earned the Government's Motion for a Downward Departure, and respectfully requests the Court to consider the timeliness of his cooperation along with the truthful, complete and reliable information that he provided.

### C. Mr. Perdue should receive a significant departure pursuant to 5H1.6 of the USSG.

Mr. Perdue and his wife have always provided for their family.  Their son is currently enrolled in a Division III school at Eastern University in King of Prussia, Pennsylvania.  He plays baseball for the school.  Unfortunately, he is not on scholarship and Mr. Perdue and his wife have taken on significant financial obligations to allow his son to attend college.  His son significantly relies upon financial contributions from Mr. Perdue and his wife.

A sentence of incarceration has the potential to be devastating not only to Mr. Perdue but to his family as well.  If his income is taken away from the family, his son will no longer be able to attend this college.  These are the exceptional circumstances that allow for departures to be made under the guidelines, and in this case, a departure pursuant to this section is warranted due to the family responsibilities and financial obligations that Mr. Perdue has.

### D. A Variance is authorized and appropriate in this case pursuant to 18 U.S.C. § 3553(a).

This Court may vary from the advisory Guideline range to impose any reasonable sentence based upon a consideration of the § 3553(a) factors. The factors set forth in 18 U.S.C. § 3553(a), are as follows:

> (a)     Factors to be considered in imposing a sentence--The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 92 of this subsection. The court, in determining the particular sentence to be imposed, shall consider-
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed-
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and sentencing range established for-
>
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines-
>>
>>> (i) issued by the Sentencing Commission pursuant to section 944(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>>> (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

>> (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);
>
> (5) any pertinent policy statement-
>
>> (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress  (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>>
>> (B) that, except as provided in section 3742(g), is in effect on the    date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553.

As this Court is well aware, the inquiry into § 3553 is broad ranging. "Generally, if the reasons justifying the variance are tied to Section 3553(a) and are plausible, the sentence will be deemed reasonable." *United States v. McClung*, 483 F.3d 273, 277 (4th Cir. 2006). Moreover, a sentence greater than necessary to achieve the goals of § 3553(a) is unreasonable. *See* 18 U.S.C. § 3553(a); *see also United States v. Shortt*, 485 F.3d 243, 248 (4th Cir. 2007). As the United States Supreme Court has recently reiterated, "'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (quoting *Williams v. People of State of New York*, 337 U.S. 241, 247 (1949)).

In light of these cases, and the factors of 18 U.S.C. § 3553(a), Mr. Perdue submits that the advisory guidelines result in a sentence of incarceration that is greater than necessary.  Mr.

Perdue contends that the purposes set forth in the aforementioned statute are satisfied by granting him a variance and arriving at a non-incarceration sentence of probation.

### (i) The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant, and the Need for the Sentence Imposed. 18 U.S.C. § 3553(a)(1) and (2).

The factors in § 3553(a)(1) and (2) favor granting Mr. Perdue a downward variance in this case. Other than the conduct involved in submitting appraisals on four (4) homes that is a part of the instant case, Mr. Perdue has lived a law-abiding and productive life. Mr. Perdue is Forty-Nine (49) years old and has no criminal history. The conduct giving rise to Mr. Perdue's plea occurred six to seven years ago in 2010 and 2011. Since that time, Mr. Perdue has not engaged in criminal conduct of any sort, and has instead continued to try and better himself professionally.[4][5] It's important to note that the fact that his criminal conduct occurred over six to seven years ago alone is not meant to suggest that the passage of time relieves someone of responsibility. Instead, it is highlighted because it demonstrates that Mr. Perdue can live, and has lived, a law-abiding life over a long period of time. Mr. Perdue has made mistakes and errors in judgment during the brief period of time years ago, and for that he has paid, and is continuing to pay, significantly. As a result of his mistakes in judgment and becoming involved with Co-Defendant, he eventually filed for bankruptcy. His career has been decimated, his finances and reputation have been ruined, and this conviction will always inhibit his abilities to gain certain employment and enjoy other rights and opportunities. Additionally, restitution will be ordered in this case and he will be faced with paying this back over time.

Upon being confronted with his illegal conduct, Mr. Perdue timely cooperated with the

---

[4] Mr. Perdue will find out next week whether he has received a promotion to be the Store Manager at Dick's Sporting Goods.

[5] Additionally, in his role as a Manager at Dick's Sporting Goods, he has recently assisted the Prince William County Police with a credit card fraud case involving an individual who was also arrested by a neighboring jurisdiction for theft as well.

Government and accepted responsibility for his own actions.  He has always maintained remorse for his conduct as well.

The years that have passed since this matter has been pending have been extremely stressful. Mr. Perdue has been treated for anxiety problems previously and the last six to seven years have produced a tremendous amount of anxiety for him.  The fear of the unknown with regard to his potential punishment is something that has weighed heavily on Mr. Perdue the last several years.

Mr. Perdue attended college but did not graduate.  I highlight this because he was eager to go to work professionally and he chose to begin his career short of graduating from college.  He is married and has two (2) children (daughter and son) ages 23 and 18.  His son plays baseball in college and Mr. Perdue travels as often as he can to go and watch his son play.  He is heavily involved in his childrens' lives and does everything he can to emotionally and financially support them along with his wife.

In a letter written by William E. McGraw describing Mr. Perdue's character, he notes "As for Brian's character, it is unblemished.  He is married and has two wonderful children.  Brian is honest and holds high moral standards.  He has always wanted to be successful which I believe he has done.  He is self motivated and I am proud to call my friend.  He is intelligent and appears to always be able to make good decisions." (Exhibit A).  He further states "I firmly believe that Brian is honest and trustworthy as well as loyal.  Therefore, on a scale from one to ten, I would rate him a ten pertaining to his character." *Id*.

In a letter written by David A. Klejka describing Mr. Perdue's character, he notes "I've know Mr. Brian Perdue for eleven years.  During that time Mr. Perdue has shown himself to be a man of outstanding character.  I met Mr. Perdue while coaching youth baseball.  Mr. Perdue was

also a baseball coach.  Mr. Perdue approached me about helping coach a travel team.  It was during that time that I found Mr. Perdue to have outstanding character.  He is very honest and straight forward." (Exhibit B).  He further notes "Mr. Perdue is a consummate professional and treats others with courtesy and respect.  He is an honest man.  I grew up during a time when a man's word was his bond, Mr. Perdue is the epitome of that." *Id*.

      Mr. Perdue has made evert effort to make amends for his conduct.  His lack of criminal history prior to the events leading up to this case, and in the years since, demonstrate he does not pose a threat to his fellow citizens.  He has never shown any violent or dangerous tendencies, nor does he have any alcohol or substance abuse concerns.  This case is about a good and productive person who made bad decisions during a very brief time of his life.  This does not minimalize or trivialize his conduct, but simply places it in perspective for the Court to consider.

      **(ii)   18 U.S.C. § 3553(a)(3)-(5)**

      The factors set forth in subsections three (3) through five (5) of § 3553(a) all relate to considerations regarding the types of sentences available, and the Sentencing Guidelines and policy statements applicable to the case.

      As the United States Supreme Court just recently reiterated, "'the punishment should fit the offender and not merely the crime.'" *Pepper*, 131 S. Ct. at 1240 (quoting *People of State of New York*, 337 U.S. at 247).  This case involves serious conduct, and Mr. Perdue understands that his conduct is very serious and has contributed to significant losses.  However, as pointed out previously, Mr. Perdue has never been exposed to the criminal system.  The advisory guideline range for Mr. Perdue is 24 to 30 months, which is undoubtedly an eternity for Mr. Perdue.  This case fits squarely into the category of cases that § 3553(a) was meant to address.  A variance below the guideline range to a non-incarceration sentence of probation in this case

would satisfy the purposes of § 3553(a) and serve the interests of justice.

> **(iii) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct 18 U.S.C. § 3553(a)(6).**

The PSR did not classify Ms. Perdue as a leader, manager or organizer and his participation in the scheme was limited to producing inflated appraisals at the direction of his Co-Defendant who was the leader and organizer of this scheme.

Upon information and belief, Mr. Perdue is the only individual who has significantly cooperated in this case, and his cooperation has been substantial. Mr. Perdue submits that consideration needs to be given to the particular facts and circumstances of his case and it should not be viewed the same as his Co-Defendant.

It is unique to see someone like Mr. Perdue facing the sentence he is facing in federal court with his lack of criminal history. As demonstrated by the previously mentioned facts, a non-incarceration sentence of probation is both consistent with and supported by the $ 3553(a) factors. First, the nature and circumstances of Mr. Perdue's offense and his personal history and character strongly support the conclusion that Mr. Perdue is unlikely to commit any further crime. Second, there is no minimum statutory sentence for Mr. Perdue and a non-incarceration sentence is therefore available to the Court. Third, Mr. Perdue has already suffered, and will continue to suffer, the devastating consequences of his conduct. He has accepted responsibility, expressed sincere remorse, and done everything possible to assist the Government with information that he knew about the case.

For these reasons, a non-incarceration sentence of probation is "sufficient, but not greater than necessary" to promote respect for the law, provide just punishment for the offense and serve as an adequate deterrence to criminal conduct. *See* l8 U.S.C. $ 3553(a).

## **CONCLUSION**

  Mr. Perdue now stands before the Court seeking leniency and compassion and thankfully the Court has the ability and discretion to exercise such leniency and compassion. Based upon the factors submitted in this memorandum, and the PSR in this matter, Mr. Perdue respectfully requests the Court to go below the advisory guideline range to a non-incarceration probation sentence.

                Respectfully submitted,

                /s/Ashley B. Nance
                Ashley B. Nance
                KING, LOVE & HUPFER, LLC
                Post Office Box 1764
                Florence, South Carolina 29503-1764
                Federal ID No.11093
                anance@kingandlove.com
                (843) 407-5525

Florence, South Carolina       Attorney for Defendant
April 8, 2017           Brian Keith Perdue